RECEIVED

APR 2 8 2011

TONY R. MOORE, CLERK
BY_____ DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| GREENWOOD 950, L.L.C. | CIVIL ACTION NO: 10-0419 |
| VERSUS | JUDGE DONALD E. WALTER |
| CHESAPEAKE LOUISIANA, L.P. | MAGISTRATE JUDGE HORNSBY |

## MEMORANDUM RULING

Before the Court is a Motion for Summary Judgment filed by the Defendant, Chesapeake Louisiana, L.P. ("Chesapeake"). [Doc. #26]. Plaintiff, Greenwood 950, L.L.C. ("Greenwood"), opposes the motion. [Doc. #35]. For the reasons stated herein, Chesapeake's motion is **GRANTED**, and this matter is **DISMISSED WITH PREJUDICE**.

## BACKGROUND FACTS

On February 25, 2010, Greenwood filed a state court petition in the 1st Judicial District Court for Caddo Parish, Louisiana, seeking damages allegedly caused by Chesapeake's drilling operations premised on an Oil, Gas, and Mineral Lease dated January 31, 2008 (herein "mineral lease"). [Doc. #1-1]. On March 18, 2010, Chesapeake removed Greenwood's lawsuit to federal court pursuant to 28 U.S.C. § 1441 *et seq* and 28 U.S.C. § 1332. [Doc. #1].

The mineral lease executed between Greenwood and Chesapeake covers approximately 238.268 acres in Township 15 North, Range 15 West, Caddo Parish, Louisiana. [Doc. #1-1]. Prior to the execution of the lease, Greenwood platted and partially developed a subdivision on the property. *Id.* At the time of the lease negotiation Greenwood had already sold several lots and had placed roads and utilities on the property. *Id.* For this reason, the parties negotiated and designated the area in which Chesapeake would be permitted to conduct surface operations. [Doc. #26; Statement of Uncontested Facts ¶ 3]. After the lease was executed, Chesapeake began conducting

surface operations on approximately 16.48 acres of the property comprised of two well pad sites totaling 14.85 acres and a 1.63 acre access road to the well pad sites. [Doc. #26; Statement of Uncontested Facts ¶ 4]. Chesapeake confined its surface operations to the designated areas agreed to by Greenwood and Chesapeake in the mineral lease. [Doc. #26, Statement of Uncontested Facts ¶ 5; Mineral Lease, Exhibit "B"].

Greenwood alleges that the drilling operations have caused damage to the surface, primarily the inability to expand the planned subdivision development. [Doc. #1-1, ¶ 4]. Greenwood alleges that it discussed the potential damages to the subdivision development with Chesapeake prior to the signing of the lease. [Doc. #1-1, ¶ 6]. Greenwood alleges that its corporate representative, Michael Salter ("Salter"), was assured that "all damages" would be paid, including payment for the lots actually taken. Greenwood states that Salter was assured that additional provisions would be added to the lease in the form of an addendum, which were not included in the mineral lease. [Doc. #1-1, ¶ 6].[1] Greenwood alleges that it is has suffered damage because Chesapeake has taken control of the main subdivision road and has placed their drill sites directly on the road, preventing development of the subdivision as designed and preventing further lot sales. [Doc. #1-1, ¶ 7].

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Quality Infusion Care. Inc. v. Health Care Serv. Corp.*, 628 F.3d 725, 728 (5th

---

[1] The Court notes that Greenwood changed counsel between the filing of its state court petition and the filing of its Opposition to Chesapeake's motion for summary judgment. In its Opposition brief Greenwood abandons its claim that the appropriate language was never added to the mineral lease and instead argues that Exhibit C of the mineral lease contains language sufficient to allow for the recovery of "all damages" including damages related to the inability to develop the subdivision as planned. [Doc. #35].

Cir.2010).[2] "Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004). If the movant demonstrates the absence of a genuine dispute of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine [dispute] for trial." *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 141 (5th Cir. 2004). Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant then summary judgment should be granted. *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005).

## LAW AND ANALYSIS

A mineral lease is a contract by which a lessee is granted the right to explore for and produce minerals in consideration of the payment of rental or bonus. *Cascio v. Twin Cities Development, LLC*, 48 So.3d 341, 342 (La. App. 2d Cir. 2010) (citations omitted). A mineral lease contract is interpreted using the general rules of contract interpretation set forth in the Louisiana Civil Code. *Id.* A contract functions as the law between the parties, and as such, the purpose of contract interpretation is to determine the common intent of the parties. La. Civ. Code art. 2045; *Corbello v. Iowa Production*, 850 So.2d 686 (La. 2003). "When the words of a contract are clear and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code art. 2046. "In ascertaining the common intent, words and phrases in a [contract] are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have

---

[2] The newly amended Rule 56 requires that there be "no genuine dispute as to any material fact," but this change does not alter the court's analysis. Fed.R.Civ.P. 56(a) and advisory committee's note.

3

acquired a technical meaning, in which case the words must be ascribed their technical meaning." *Sims v. Mulhearn Funeral Home, Inc.*, 956 So.2d 583, 589 (La. 2007) (internal quotation marks and citations omitted); La. Civ. Code art. 2047. "Words susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract." La. Civ. Code art. 2048. "Each provision of a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La. Civ. Code art. 2049.

The meaning and intent of the parties to the written contract must first be sought within the four corners of the instrument and cannot be explained or contradicted by extrinsic evidence. *See* La. Civ. Code. art. 1848. The use of extrinsic evidence is proper only where a contract is ambiguous after an examination of the four corners of the agreement. *Kappa Loyal, LLC v. Plaisance Dragline & Dredging Co.*, 848 So.2d 765 (La. App. 5th Cir. 2003). The determination of whether a contract is clear or ambiguous is a matter of law. *Stephenson v. Petrohawk Properties, L.P.*, 37 So.3d 1145, 1149 (La. App. 2d Cir. 2010) (citation omitted). "An ambiguity exists as to the parties' intent when the contract lacks a provision on the issue or when the language of the contract is uncertain or fairly acceptable to more than one interpretation." *Id.* (citations omitted).

Greenwood's claim for consequential damages appears to rest entirely upon the language found in paragraph 1 of Exhibit "C" attached to the mineral lease, which reads as follows:

> Lessee agrees to repair all surface damages done by its operations or shall pay Lessor for all damages caused by any operations hereunder to any property, both real and personal, of Lessor or Lessor's tenant, if any, including but not limited to, water wells, growing crops (including grass), trees, all animals and livestock, fences, gates, locks, cattle guards, roads, terraces, culverts, bridges, potable water, tanks, reservoirs, drainage, dwellings, buildings, barns and all other structures and improvements on the leased premises. Lessor specifically agrees that the obligations and liabilities of the Lessee and its successors and assigns for reclamation, restoration, repair or maintenance of the surface or subsurface of the leased premises shall never exceed fair market value (determined as of the effective date hereof) of the lands covered by

4

this lease, or the portion thereof, for which such reclamation, restoration, repair or maintenance is required. Lessee shall, upon completion of the drilling operations on any well drilled by Lessee on the leased premises and/or the abandonment of any well drilled by Lessee, at Lessee's own cost and expense, and within a reasonable time, not to exceed six (6) months after such completion of drilling operations or abandonment, fill all excavations, empty and fill with soil all slush pits, neutralize all acids, level off all mounds, remove all debris, and leave the leased premises in, as near as is practicable, the same condition as it was, at the time of commencement of Lessee's operations on the land.

[Doc. #26, Exhibit 1 - Mineral Lease, Exhibit "C", ¶ 1]. More specifically, Greenwood relies on the phrase "...or shall pay Lessor for <u>all damages caused by any operations hereunder to any property, both real and personal</u>, of Lessor or Lessor's tenant, if any..." [*Id.* (emphasis added); Doc. #35]. Greenwood argues that the very purpose of the clause in question is to provide for the payment of actual and consequential damages to its future development of the subdivision. [Doc. #35 at 6].

The rules of contract interpretation require the Court to review each provision in light of the other provisions so that each is given the meaning suggested by the contract as a whole. Upon examination of phrase at issue, the paragraph in which it is contained, and the contract as a whole, the Court finds that the contested language does not contemplate damages for Greenwood's inability to develop the subdivision outside of the areas designated for surface operations. Further, no ambiguity exists that would necessitate the consideration of extrinsic evidence outside the four corners of the contract.

Paragraph 1 of Exhibit "C" of the mineral lease, read in its entirety, limits Chesapeake's liability to surface damages. The paragraph begins with a statement that "Lessee agrees to repair <u>all surface damages</u> done by its operations or shall pay Lessor for all damages caused by any operations hereunder to any property, both real and personal, of Lessor...." [Doc. #26, Exhibit 1 - Mineral Lease, Exhibit "C", ¶ 1 (emphasis added)]. The paragraph continues by enumerating

various examples of property for which Chesapeake agrees to repair (livestock, crops, dwellings, trees, etc.), all of which are a type of potential surface damage. The paragraph concludes by setting a maximum liability of the Lessor for the "reclamation, restoration, repair or maintenance of the surface or subsurface of the leased premises" to the fair market value of the lands covered by the lease (determined from the effective date). *Id.* If the market value is determined using the effective date of the lease (September 28, 2008) the potential value of any undeveloped expansion of the subdivision is limited by the terms of the very paragraph Greenwood relies upon as support for its claim for consequential damages.[3]

A reading of Greenwood's Opposition brief and the attached deposition testimony of Salter, Greenwood's representative, demonstrates that Salter may have believed that he had reached an agreement with Chesapeake for the reimbursement for damages premised on any future inability to develop the subdivision. [Doc. #35, Exhibit A]. However, this is a factual bridge that the Court is not required to cross. When the words of a contract are clear and do not lead to absurd consequences no further interpretation may be made in search of the parties intent. *See* La Civ. Code art. 2046. The contract is not ambiguous, and therefore, no examination of extrinsic evidence is allowed.

The parties clearly negotiated and limited the area to which Chesapeake could conduct drilling operations prior to the signing of the mineral lease. The parties set forth a provision which states in relevant part: "Lesees' right to conduct drilling and production operations on the leased premises shall be limited to those areas as shown on the Plat marked Exhibit "B" attached hereto and made part of hereof for all purposes." [Doc. #26, Exhibit 1 - Mineral Lease, Exhibit "C" ¶ 3.]. The

---

[3] Paragraph 17 of the mineral lease contains similar language limiting liability for actual damages caused by operations to the fair market value of the lands covered by the lease as of the effective date of the contract. [Doc. #26, Exhibit 1 - Mineral Lease at ¶ 17].

limited area is shown in Exhibit "B" of the mineral lease with the notation "surface use area". [Doc. #26, Exhibit 1 - Mineral Lease, Exhibit "B"]. The "surface use area" undisputably covers several lots and a portion of the existing road. *Id.* Greenwood had the opportunity to negotiate a provision for the payment of consequential damages resulting from its inability to proceed in developing the subdivision as a term of the mineral lease. Alternatively, Greenwood could have negotiated the loss of value of future development of the subdivision into the total consideration received in exchange for the signing of the mineral lease.

In two separate provisions the mineral lease limits Chesapeake's damages to the fair market value of the 16.48 acres of land utilized for surface operations (determined as of the effective date [of the lease - September 28, 2008]). [Doc. #26, Exhibit 1 - Mineral Lease ¶ 17 and Exhibit "C" ¶ 1]. Accordingly, Greenwood's damages are limited by the terms of the mineral lease to liquidated damages as set forth in Exhibit "C" paragraph 4, and to actual surface damages caused by Chesapeake's operations up to the maximum liability allowed under the contract - the fair market value of the 16.48 acres of land designated by the mineral lease.

## CONCLUSION

For the foregoing reasons, Chesapeake's Motion for Summary Judgment [Doc. #26] is hereby **GRANTED**. Greenwood 950, L.L.C.'s cause of action is **DISMISSED WITH PREJUDICE**.

**THUS DONE AND SIGNED**, this 28th day of April, 2011.

DONALD E. WALTER
UNITED STATES DISTRICT JUDGE